**EXHIBIT A**

# IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| **Nationwide Logistics LLC** | * | **CASE NO.** _____ |
| P.O. Box 14508 | * | |
| Cincinnati, Ohio 45250 | * | **Judge** _____ |
| | * | |
| **Plaintiff** | * | |
| | * | **COMPLAINT** |
| **v.** | * | |
| | * | |
| **T & L Enterprise, Inc.** | * | |
| 3033 Planters Walk Ct. | * | |
| Charlotte, North Carolina 28210-8025 | * | |
| | * | |
| Serve Also: | * | |
| T & L Enterprise, Inc. | * | |
| c/o Tsung Tun Chiu | * | |
| Registered Agent | * | |
| 1339 Baxter St., Ste. 200 | * | |
| Charlotte, North Carolina 28204-3067 | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | * | |

Plaintiff, Nationwide Logistics LLC (referred to herein as "Plaintiff" or "NWL"), by and through counsel, states as follows for its Complaint against Defendant, T & L Enterprise, Inc., (referred to hereinafter as "Defendant" or "T & L"):

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff, Nationwide Logistics LLC, is a New Mexico limited liability company licensed to transact business in the State of Ohio, with its principal office located at 901 Adams Crossing, Cincinnati, Ohio 45202. Plaintiff is engaged in the business of providing transportation brokerage services pursuant to a certificate of authority issued by the Federal Motor Carrier Safety Administration ("the FMCSA").

**EXHIBIT A**

2.    Upon information and belief, Defendant, T & L Enterprise, Inc., is a corporation organized and existing under the laws of the State of North Carolina, with its principal office located at 3033 Planters Walk Ct., Charlotte, North Carolina 28210-8025.

3.    Upon information and belief, Defendant is in the business of transporting property and goods for hire as a motor carrier in interstate commerce, operating pursuant to a certificate of authority issued by the FMCSA.

4.    This action involves certain property that was damaged while in the care, custody and control of Defendant.

5.    On December 8, 2015, Plaintiff entered into a Broker-Carrier Agreement (the "Agreement") with Defendant, pursuant to which Defendant agreed to serve as a motor carrier and transport goods on behalf of Plaintiff's customers. A true and accurate copy of the Agreement is attached hereto as Exhibit A.

6.    Venue and Jurisdiction are proper as Defendant entered into an Agreement with a Company located in Ohio and pursuant to Section 23 of the Agreement attached as Exhibit A, which states that venue shall be Hamilton County, Ohio and each party to the agreement submits to Ohio jurisdiction. Thus, the Agreement and this case are also controlled and governed by Ohio law.

7.    Defendant also agreed, pursuant to the Agreement, to reimburse Plaintiff for all court costs, fees, including attorneys' fees, and other expenses arising out of this load.

## FACTS

8.    Plaintiff incorporates Paragraphs 1 through 7 as if fully rewritten herein.

9.    Pursuant to the Agreement, NWL engaged Defendant to transport a Trailmobile Trailer (the "Trailer") from Fort Bragg, North Carolina, to Nellysville, Virginia, and Defendant

- 2 -

**EXHIBIT A**

agreed to transport such Trailer.  Pick-up for the Trailer was made by Defendant on September 13, 2016. A true and accurate copy of the Bill of Lading for the Trailer is attached hereto as Exhibit B.

10.     During transport of the above-mentioned Trailer, Defendant's driver was involved in an accident, causing significant damage to the Trailer, in an amount of $13,871.12, which Plaintiff paid.  See Exhibit C.

11.     As a result of Defendant's conduct, Plaintiff has suffered a net loss of $13,871.12.

12.     The damage to the trailer resulted in a freight claim being filed by Plaintiff.

13.     As of the date of this Complaint, Defendant has failed to pay Plaintiff the $13,871.12 Defendant owes Plaintiff.

14.     Under the Agreement, Defendant agreed to accept liability for any loss, damage or delay with respect to the Trailer transported thereunder.

15.     Also, under the Agreement, Defendant agreed to indemnify Plaintiff against any and all loss, liability, judgment, claims, fines, costs and expenses, including reasonable attorneys' fees arising out of or in connection with a breach of the Agreement by Defendant. See Exhibit A.

**COUNT I**
**BREACH OF CONTRACT**

16.     Plaintiff incorporates Paragraphs 1 through 15 as if fully rewritten herein.

17.     Pursuant to the Agreement, Plaintiff arranged for the Trailer to be tendered to Defendant for safe delivery to their agreed upon final destination.

18.     At the time the Trailer was tendered to Defendant, such Trailer was in good and acceptable condition.

19.     At all times thereafter, the Trailer was in the care, custody and control of Defendant.

E-FILED 04/04/2017 03:16 PM  /  CONFIRMATION 614294  /  A 1701874  /  COMMON PLEAS DIVISION  /  IFI

**EXHIBIT A**

20.     Defendant failed to deliver the Trailer to the destination in good order and condition. Specifically, Defendant failed to maintain the Trailer and prevent damage. Thus, upon arrival, the Trailer was damaged.

21.     Therefore, Defendant is in breach of the Agreement.

22.     Plaintiff has fully performed all of its duties and obligations under the Agreement.

23.     Defendant breached the terms of the Agreement by failing to deliver the Trailer as promised in the Agreement and associated shipping documents, for which Plaintiff seeks damages in an amount not less than $13,871.12, plus pre-judgment and post-judgment interest, costs, expenses and attorneys' fees, as outlined in the Agreement, and/or under applicable law.

**COUNT II**
**VIOLATION OF CARMACK AMENDMENT**

24.     Plaintiff incorporates Paragraphs 1 through 23 as if fully rewritten herein.

25.     At all times relevant hereto, Defendant was engaged in the business of transporting property and goods for hire as a motor carrier in interstate commerce, pursuant to a certificate of authority issued by the Federal Motor Carrier Safety Administration.

26.     By failing to deliver the Trailer in the same order and condition as when such Trailer was received, Defendant breached, failed and violated its duties and obligations as a motor carrier, for which Defendant is liable under the Carmack Amendment, 49 U.S.C. Section §§ 14706, et seq., for Plaintiff's actual loss in an amount to be established at trial, but not less than $13,871.12, plus pre-judgment and post-judgment interest thereon, costs, expenses and attorneys' fees.

**COUNT III**
**NEGLIGENCE**

27.     Plaintiff incorporates Paragraphs 1 through 26 as if fully rewritten herein.

28.     At all times during shipment, the Trailer was under the care, custody and control of Defendant.

- 4 -

**EXHIBIT A**

29.     At all times during shipment, the Trailer was to be maintained by Defendant in a way to prevent damage.

30.     During transport, Defendant failed to maintain the proper transport causing damage to the Trailer.

31.     Defendant had a duty to ensure that the Trailer was transported in the manner negotiated by the parties and/or in a way to prevent damage to the Trailer.

32.     Defendant breached that duty.

33.     Defendant's failure to properly transport the Trailer was the actual and proximate cause of Plaintiff's damages in an amount not less than $13,871.12, plus pre-judgment and post-judgment interest thereon, costs, expenses and attorneys' fees.

**WHEREFORE**, Plaintiff, Nationwide Logistics LLC respectfully demands relief as follows:

    i.     Judgment against Defendant T & L Enterprise, Inc., on Counts I, II, and III, in an amount not less than $13,871.12;

    ii.     An award of pre-judgment and post-judgment interest;

    iii.     An award of Plaintiff's attorneys' fees, court costs and expenses; and

    iv.     Such other and further relief as the Court finds just or equitable.

**EXHIBIT A**

Respectfully submitted,


*/s/ Thomas P. Doyle*
Thomas P. Doyle (0085418)
Doyle & Hassman, LLC
526 York Street
Newport, Kentucky, 41071
Phone: (513) 321-0900
Fax: (859) 251-5106
Email: tdoyle@doylehassmanlaw.com
***Attorney for Plaintiff, Nationwide Logistics LLC***

- 6 -

**EXHIBIT A**

## TO THE CLERK

Please serve a Summons and copy of the Complaint on the Defendant at the addresses listed in the caption hereof, by certified mail, return receipt requested.

/s/ *Thomas P. Doyle*
Thomas P. Doyle (0085418)

**EXHIBIT A**

# Exhibit A



**carrier packet**

fax back to: 888.871.0777
P: 866.414.9555
PO Box 14508
Cincinnati, OH 45250

### BROKER-CARRIER AGREEMENT

This Broker-Carrier Agreement (the "Agreement") is entered into this _8th_ day, of _DECEMBER_ , 20_15_ _____ by and between Nationwide Logistics, LLC, a New Mexico limited liability company, its affiliates and subsidiaries ("BROKER"), and _TFL ENTERPRISES_ [NAME], a(n) _CORP._ _____ [ENTITY TYPE/ INDIVIDUAL] ("CARRIER"), under the following terms and conditions. For purposes of this Agreement, Broker and Carrier are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, Broker is engaged in the business of operating as a Property Broker (as defined below), pursuant to Federal Motor Carrier Safety Administration ("FMCSA") Certificate No. MC-194259;

WHEREAS, Carrier in engaged in the business of operating as a Motor Carrier pursuant to FMCSA Certificate No. MC _453647_ ; and

WHEREAS, Broker has customers in need of freight transportation services and Broker is willing to utilize the Services of Carrier as a Motor Carrier, upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein, and for certain other good and valuable consideration, the receipt and sufficiency is acknowledged by the Parties, Broker and Carrier agree as follows:

1. DEFINITIONS: For purposes of this Agreement, the following terms shall have the meanings set forth below:

   1.1 "Broker Affiliates" shall mean any and all of Broker's parent companies, subsidiary companies, affiliates, contractors, representatives, agents, successors and assigns.

   1.2 "Customer" is any business entity or individual which is the owner of cargo, property or other items transported by Carrier under this Agreement and identified as such in any Bill of Lading associated with transportation services provided by Carrier hereunder.

   1.3 "Motor Carrier" shall have the meaning set forth in 49 USC Section 13102.

2. SCOPE OF SERVICES: Broker agrees to, from time to time, offer for shipment, and Carrier agrees to transport such quantities of freight, cargo, commodities or other items as Broker may offer, subject to Carrier's availability of suitable equipment; provided, however, that Broker shall, under no circumstances, be obligated to tender any specific number of shipments to Carrier.

3. RATES: In exchange for providing freight transportation services, Broker agrees to pay Carrier for said services in an amount equal to the rates set forth in the particular rate confirmation sheet sent by Broker to Carrier associated with each particular load, which will become part of this Agreement. The Parties shall use their best efforts to sign all rate confirmation sheets associated with the services to be provided by Carrier hereunder. However, upon Carrier picking up any load to be transported hereunder, the Parties shall...

01.2015

**initial here** _____

**EXHIBIT A**



**carrier packet**

fax back to: 888.871.0777
P: 866.414.9555
PO Box 14508
Cincinnati, OH 45250

automatically be deemed to have accepted the rate listed in the associated rate confirmation sheet regardless of whether Carrier shall have signed the same and Carrier shall be bound to transport the associated load for the rate listed thereon. Additionally, any rates, which may be verbally agreed upon, shall be deemed confirmed in writing where Carrier has billed the agreed rate and Broker has paid it. Said rates may only be amended, modified, or added to from time to time upon the mutual written agreement of the Parties which shall be effective as of the date such rate is mutually agreed to in writing and signed or acknowledged by both parties. Under no circumstances shall Broker be liable for detention, accessorial, or other additional charges of Carrier which are not contained in any particular rate confirmation sheet or otherwise mutually agreed to in writing by the Parties. Carrier specifically agrees that no released value classification or limitation of liability shall be applicable to any transportation services provided by Carrier pursuant to this Agreement.

4. SHIPPING DOCUMENTS: All freight offered to Carrier by Broker pursuant to this Agreement shall be picked up at origin by Carrier and transported, without delay, to the point of destination at the date and time specified by Broker or Customer. There shall be a bill of lading (the "Bill of Lading"), in compliance with 49 U.S.C. §80101 et seq., 49 C.F.R. §373.101 (and any amendments thereto), for each load transported by Carrier hereunder, and the Bill of Lading shall be signed by the Customer and consignee. Carrier shall be named as "carrier of record" on each Bill of Lading. Delivery shall be made by Carrier as specified in each Bill of Lading or other shipping document. Any terms of the Bill of Lading (including but not limited to payment terms) inconsistent with the terms of this Agreement shall be controlled by the terms of this Agreement. Carrier shall deliver a copy of a completed Bill of Lading, signed delivery receipt, and such other documentation as may be agreed to by the Parties within ten (10) days of the delivery date for each shipment. Notwithstanding the foregoing, failure to issue a Bill of Lading, or sign a Bill of Lading acknowledging receipt of the freight by Carrier, shall not affect the liability of Carrier.

5. INVOICES; PAYMENTS; AND SET-OFF RIGHTS:

   5.1    Invoices. Consistent with Section 4 above, within five (5) days of the delivery date for each shipment, Carrier agrees to submit to Broker a written invoice for the transportation services provided by it, and such invoice shall include a copy of the associated Bill of Lading, signed delivery receipt and other applicable shipping documents. Each freight invoice shall also contain the trip or pro number assigned to each shipment by Broker at the time it is offered. Carrier shall send all invoices and Bills of Lading and related documents to Broker at: Nationwide Logistics, LLC, P.O. Box 14508, Cincinnati, OH 45250, or by fax or other electronic means as stated in any particular rate confirmation sheet sent from Broker to Carrier.

   5.2    Payment. Subject to Carrier's rights of set-off under Section 5.3 below, The Parties agree that BROKER is the sole party responsible for payment of Carrier's charges. Carrier agrees to seek payment for freight charges from Broker only. Broker agrees to pay Carrier in accordance with the agreed upon rates within thirty (30) days of receipt of the associated invoice.

   5.3    Set-Off Rights. Notwithstanding anything to the contrary contained elsewhere in this Agreement, Broker shall have the right to set-off against the amounts payable to Carrier, any and all damages, claims, losses, liabilities and expenses, including, without limitation, reasonable attorneys' fees, and other expenses, incurred by Broker as a result of: (i) any breach of any representation or warranty of Carrier under this Agreement, (ii) any breach of this Agreement by Carrier, (iii) any indemnification obligation of Carrier under this Agreement, (iv) the negligence or intentional acts of Carrier and its drivers, employees, agents, contractors, successors and assigns, (v) the failure by Carrier to deliver any freight transported hereunder in accordance with the rate schedule provided by Broker or listed in any associated rate confirmation sheet, (vi) delays in shipment of freight above caused by Carrier's services hereunder, and (vi) freight claims or other claims filed against Broker by third parties which are in relation to transported hereunder. Broker's right of set-off shall be in addition to, and not in substitution of, any other right it has under this Agreement, or at law or in equity.

6. ACCEPTANCE OF LOADS: Once Carrier accepts a load offered by Broker, if Carrier then fails to pick up the load or then fails to cover the load, Carrier agrees to reimburse Broker such amounts as are necessary to compensate Broker for the damages incurred in the expense of covering the load by alternative means.

7. LIABILITY; CARGO LOSS; DELAY; AND/OR DAMAGE

01.2015

initial here



**carrier packet**

fax back to: 888.871.0777
P: 866.414.9555
PO Box 14508
Cincinnati, OH 45250

7.1 Unless otherwise agreed in writing, Carrier shall become fully responsible/liable for the freight when it takes/receives possession thereof, and the trailer(s) is loaded, regardless of whether a Bill of Lading has been issued, and/or signed, and or delivered to Carrier, and which responsibility/liability shall continue until delivery of the shipment to the consignee and the consignee signs the Bill of Lading or delivery receipt.

7.2 Carrier shall be liable to Broker and all Customers and consignees for the full actual value of all loss, damage, destruction, delay, or theft of any goods transported by Carrier pursuant to this Agreement while such goods are in the care, custody, and control of Carrier as provided in 49 USC §14706. Carrier expressly agrees to be treated as Motor Carrier for all liability purposes. Carrier shall promptly handle and resolve all claims which are submitted either by Broker or directly by any Customer or consignee for loss or damage to any cargo transported by Carrier. Notwithstanding the terms of 49 C.F.R. §370.9, Carrier has thirty (30) days from the date any claim is received to register said claim, and Carrier has an additional ninety (90) days to either pay, decline or make settlement offer in writing on all cargo loss or damage claims. Failure of Carrier to pay, decline or offer settlement within the period listed above shall be deemed admission by Carrier of full liability for the amount claimed and a material breach of this Agreement. Carrier further agrees to indemnify and hold harmless Broker for all losses, damages and expenses Broker may sustain or incur, including but not limited to claims for lost profits or plant shutdown fees, arising out of the loss, damage, destruction, delay or theft of any goods transported by Carrier pursuant to this Agreement while such goods are in the care, custody and control of Carrier. The provision contained in Section 9 of this Agreement relating to the amount and type of insurance which Carrier is required to provide, shall in no way limit the obligations of Carrier set forth in this Section 7.2.

7.3 Broker shall have no liability for any loss or damage to any goods transported by Carrier on shipments tendered by Broker. Carrier shall be solely and exclusively responsible for loss or damage to, or delay in delivery of, goods and shipments transported by Carrier under this Agreement. Despite the fact that Broker is not liable for cargo loss, damage or delay claims, Broker shall have the right to pay such claim(s) to the Customer, or any consignee or other third party, in which case Carrier shall then be responsible to Broker for such claim(s), as though Broker (i) were the Customer or (ii) had received an assignment of such claim(s) from the Customer.

8. **REPRESENTATIONS AND WARRANTIES OF CARRIER:** Carrier makes the following representations and warranties:

8.1 At all times while this Agreement is in effect, Carrier is and shall be registered as a Motor Carrier with the FMCSA and is and shall be authorized to provide transportation of property with Customers and receivers and/or brokers of general commodities. At all times while this Agreement is in effect, Carrier shall (i) maintain proper authority to provide the services contemplated herein, (ii) maintain a satisfactory U.S. DOT safety rating, (iii) utilize only fully qualified personnel who have all of the appropriate licenses and certificates, including but not limited to a commercial driver's license, and (iv) maintain its equipment in good order and in compliance with all applicable laws. Carrier will notify Broker immediately if its Federal Operating Authority is revoked, suspended, or rendered inactive by the FMCSA for any reason.

8.2 At all times while this Agreement is in effect, Carrier shall maintain compliance with all applicable federal, state and local laws, rules, regulations, and conditions governing its activities and relating to the provision of its services including, but not limited to: transportation of Hazardous Materials, (including the licensing and training of drivers), as defined in 49 C.F.R. § 171.8000, § 173, and § 397 et seq. to the extent that any shipments hereunder constitute Hazardous Materials; security regulations; owner operator lease regulations; loading and securement of freight regulations; implementation and maintenance of driver safety regulations including, but not limited to, hiring, controlled substances, and hours of service regulations; sanitation, temperatures, and contamination requirements for transporting food, perishable, and other products, qualification and licensing and training of drivers; implementation and maintenance of equipment safety regulations; maintenance and control of the means and method of transportation including, but not limited to, performance of its drivers.

8.3 At all times while this Agreement is in effect, Carrier shall comply with 49 C.F.R. §370.1 et seq. and any amendments and/or any other applicable regulations adopted by the FMCSA, U.S. Department of Transportation, or any applicable state regulatory agency for processing all loss and damage claims and salvage.

8.4 Carrier is solely responsible for any and all management, governing, discipline, direction and control of its employees, owner operators, and equipment with respect to operating within all applicable federal and state legal and regulatory requirements to ensure the safe operation of Carrier's vehicles, drivers and facilities. Carrier and Broker agree that safe and legal operation of the Carrier and its drivers shall completely and without question govern and supersede any service requests, demands or preferences.

01.2015

initial here 



**NATIONWIDE LOGISTICS**

**carrier packet**
fax back to: 888.871.0777
P: 866.414.9555
PO Box 14508
Cincinnati, OH 45250

instructions, information from Broker to Broker's customer(s) with respect to any shipment at any time. At all times while this Agreement is in effect, Carrier shall, at its expense, furnish all equipment, fuel, supplies, insurance, maintenance, and properly qualified personnel necessary to perform the services hereunder. Carrier shall transport the property, under its own operating authority and equipment; subject to the terms of this Agreement. Carrier shall not "trip lease", Broker, subcontract, interline, or otherwise assign loads offered to it by Broker to another carrier or property broker without the express written consent of Broker.

8.5    At no time while this Agreement is in effect shall Carrier have an "Unsatisfactory" or "Unfit" safety rating as determined by the FMCSA. Carrier has no knowledge of any threatened or pending interventions by the FMCSA under CSA 2010; nor is Carrier subject to any investigation or disciplinary action by any state agency related to enforcement of safety laws and regulations. If Carrier receives an "Unsatisfactory" or "Unfit" safety rating, or a rating is changed from "Satisfactory" to "Conditional" or from "Continue to Operate" to "Marginal", Carrier shall immediately notify Broker and shall not transport any shipment hereunder without Broker's prior written consent. The provisions of this paragraph are intended to include safety rating designations which may replace those above, which are subject to change by the FMCSA at any time.

8.6    At least once per calendar month while this Agreement is in effect, Carrier shall inspect or hire a service representative to inspect each refrigeration or heating unit associated with trailers used by Carrier to transport freight hereunder. Carrier shall maintain a record of each inspection of refrigeration or heating unit and retain the records of the inspection for at least three (3) years. Carrier agrees to provide copies of all such inspection records request to the Carrier's insurance company and Broker. During shipment, Carrier shall maintain adequate fuel levels for each refrigeration or heating unit associated with trailers used by Carrier to transport freight hereunder, and Carrier hereby assumes full liability for claims and expenses incurred by the Broker and/or Customer for failure to do so.

8.7    Carrier shall provide Carrier's cargo insurance carrier with all records that relate to a loss and with any and all other records or documents requested by Carrier's cargo insurance carrier from time to time, and Carrier shall permit copies and abstracts to be made from such records.

8.8    In the event Carrier accepts a load transporting any goods to, from, or through California, CARRIER CERTIFIES, REPRESENTS AND WARRANTS THAT IT HAS REPORTED ITS COMPLIANCE WITH THE TRUCK AND BUS REGULATION OF THE CALIFORNIA AIR RESOURCES BOARD ("CARB") AND/OR IS, TOGETHER WITH ITS OWNER(S), AWARE OF THE TRUCK AND BUS REGULATION OF THE CARB AND IS IN COMPLIANCE WITH SUCH REGULATION BY USING THE ENGINE MODEL YEAR SCHEDULE. In the event perishable goods are transported under such load to, from, or through California, CARRIER CERTIFIES, REPRESENTS AND WARRANTS THAT ANY TRANSPORTATION REFRIGERATION UNIT ("TRU") EQUIPMENT FURNISHED WILL BE IN COMPLIANCE WITH THE IN-USE REQUIREMENTS OF CALIFORNIA'S TRU REGULATIONS. Carrier shall look to the Rate Confirmation Sheet for the necessary Broker information to be furnished under California's TRU regulations.

8.9    Carrier shall transport all shipments without delay and immediately notify Broker of any actual or potential delay or of any incident or circumstances that will prevent or delay delivery to the consignee or shipping destination.

8.10    Carrier shall not withhold delivery of any freight in its possession due to any dispute with Broker regarding freight charges or otherwise. Carrier hereby waives and releases all liens or other claims which it might otherwise have in and to any freight in its possession, whether under common law, or federal, state or local laws or regulations.

8.11    In transporting freight under this Agreement, Carrier shall comply with any and all laws related to the number of hours of driving or service per day or week as mandated by federal, state and relevant local laws. Broker shall not be liable in any event for Carrier failing to comply with such driving or service hour restrictions.

9. INSURANCE REQUIREMENTS:

9.1    At all times while this Agreement is in effect, Carrier shall, at its expense, obtain and maintain the following types of insurance with the following minimum limits:

(i) comprehensive general liability insurance, including contractual liability coverage, and coverage for bodily injury and property damage with limits of not less than One Million Dollars ($1,000,000.00) single limit per occurrence;

01.2015

**initial here**  initials

**EXHIBIT A**



**NATIONWIDE LOGISTICS**

**carrier packet**
fax back to: 888.871.0777
P: 865.414.9555
PO Box 14508
Cincinnati, OH 45250

(ii)    motor vehicle (including hired and non-owned vehicles) insurance covering (a) all motor vehicles used by Carrier to transport freight hereunder and (b) all of Carrier's drivers, employees, contractors, agents, representatives and assigns with limits of One Million Dollars ($1,000,000.00);

(iii)    all risk cargo liability insurance with limits of not less than One Hundred Thousand Dollars ($100,000.00) for loss of, or damage to, property carried on any one (1) motor vehicle; and

(iv)    workers' compensation insurance as required by the laws of the states in which the transportation services shall be performed.

Carrier may not have exclusions within any of the above insurance policies for unattended vehicles and unattached vehicles, theft, abandonment, or breakdown or malfunctioning of cooling or heating equipment,

In the event the FMCSA shall require greater limits or different types of insurance than those specified above during the term of this Agreement, such increased limits or different types shall supersede the aforementioned limits and types and Carrier shall obtain and maintain insurance with such increased limits. Carrier further agrees to provide Broker with a certificate of such insurance containing a clause requiring that Broker be provided thirty (30) days' advance written notice of the cancellation of any such insurance.

9.2    Upon execution of this Agreement, Carrier shall furnish Broker with Certificate(s) of Insurance, or insurance policies, demonstrating that Carrier has obtained the foregoing insurance policies. Such insurance policies shall contain a provision stating that each such policy shall not be cancelled or terminated except upon thirty (30) days advance written notice of cancellation or termination. Carrier will notify Broker immediately if any insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason; and/or if Carrier is a business entity, Carrier will notify Broker immediately if Carrier is sold, or if there is a change in control of ownership.

9.3    Nothing in this Agreement shall be construed to avoid Carrier's liability due to any exclusion or deductible in any insurance policy.

10.    INDEMNIFICATION: Carrier shall indemnify and hold harmless Broker, Broker's Affiliates, and all Customers and consignees for all losses, damages, injuries, or expenses (including reasonable attorneys' fees), incurred or sustained by Broker, Broker's Affiliates and all Customers or consignees, arising out of: (i) the failure of Carrier, and its drivers, employees, agents, contractors, successors and assigns to comply with the provisions of this Agreement. Carrier further agrees to indemnify and hold harmless Broker, Broker's Affiliates, and any Customers or consignees from any and all claims, suits, losses, fines, and/or expenses (including reasonable attorneys' fees) arising out of, based upon, or incurred because of property damage or injury to any person or persons. including death resulting therefrom which results from or arises out of: (ii) the performance or non-performance of Carrier's obligations under this Agreement by Carrier and its drivers, employees, agents, contractors, successors and assigns; (ii) the failure by Carrier and its drivers, employees, agents, contractors, successors and assigns to comply with the provisions of this Agreement; or (iii) through the willful conduct or negligence of Carrier and its drivers, employees, agents, contractors, successors and assigns.

11. CONSEQUENTIAL DAMAGES: Broker shall not be liable to Carrier for consequential damages without Broker receiving written notification of the risk of loss and the approximate financial amount and Broker's express written and signed agreement to assume such responsibility.

12.    BROKER DUTIES:

12.1    Shipments: Broker agrees to solicit and obtain freight transportation business for Carrier to the mutual benefit of Carrier and Broker, and shall use its best efforts to offer Carrier at least three (3) loads/shipments annually.

12.2    Load Information. With each load offered by Broker to Carrier, Broker shall provide Carrier with a rate confirmation detailing the rate to be paid for the load, the place of origin and destination of all shipments, and if applicable any special handling instructions or special equipment requirements, of which Broker has been timely notified.

12.3    Billing. Broker agrees to conduct all billing services associated with collecting amounts owed by Customers

01.2015

initial here 

EXHIBIT A



**carrier packet**
fax back to: 888.871.0777
P: 866.414.9555
PO Box 14508
Cincinnati, OH 45250

13.     ASSIGNMENT OF CLAIMS RIGHTS:  Carrier automatically assigns to Broker all Carrier's rights to collect freight charges from Customer or any responsible third party on receipt of payment from Broker.

14.     INDEPENDENT CONTRACTORS:  It is understood and agreed that the relationship between Broker and Carrier is that of independent contractor.  None of the terms of this Agreement or any act or omission of either party shall be construed for any purpose to express or imply a joint venture, partnership, principal/agent, fiduciary, employer/employee relationship between the parties.  Carrier shall provide the sole supervision and shall have exclusive control over the operations of its employees, contractors, subcontractors, agents, as well as all vehicles and equipment used to perform its transportation services hereunder.  Broker has not right to discipline or direct the performance of any driver and/or employee, contractors, subcontractors, or agents of Carrier.  Carrier represents and agrees that at no time and for no purpose shall it represent to any part that it is anything other than an independent contractor in its relationship to Broker.

15.     NON-EXCLUSIVE AGREEMENT: Carrier and Broker acknowledge and agree that this Agreement does not bind the respective Parties to exclusive services to each other. Either Party may enter into similar agreements with other carriers, brokers, or freight forwarders.

16.     NON-SOLICITATION: Carrier shall not solicit freight shipments for the duration of this Agreement and, for two (2) years following termination of this Agreement for any reason, from any Customer, consignor, consignee, or any customer of Broker. In the event Carrier violates this provision, the Parties agree that Broker shall be entitled to receive from Carrier as liquidated damages an amount equal to twenty percent (20%) of the gross revenue received by Carrier for the violating shipments.

17.     CONFIDENTIALITY: In addition to Confidential Information protected by law, statutory or otherwise, the Parties agree that all of their financial information and that of their customers, including but not limited to freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, freight volume requirements, as well as personal customer information, customer shipping or other logistics requirements shared or learned between the Parties and their customers, shall be treated as Confidential, and shall not be disclosed or used for any reason without prior written consent.

18.     IRREPARABLE HARM:  In the event of violation of Sections 16 or 17 by Carrier, the Parties intend and agree that the remedy at law, including monetary damages, may be inadequate and that Broker shall be entitled, in addition to any other remedy they may have, to an injunction restraining Carrier from further violation of Sections 16 or 17 above. Additionally, in the event of a violation of Sections 16 or 17 by Carrier, Carrier shall be liable to Broker for all costs and expenses incurred by Broker to enforce its rights, including, but not limited to, reasonable attorney's fees.

19.     TAXES:  Carrier acknowledges and agrees that Carrier shall be responsible for payment of any and all applicable federal, state and local payroll taxes, taxes for unemployment insurance, old age pensions, workers' compensation, social security, with respect to persons engaged in the performance of its transportation services hereunder.  Broker shall not be liable for any of the payroll-related tax obligations specified herein, and Carrier shall indemnify, defend and hold Broker harmless from any claim or liability imposed or asserted against Broker for any such obligations.

20.     Any limitations of liability for cargo loss and damage as well as other liabilities, arising out of the transportation of shipments, which originate outside the United States of America, may be subject to the laws of the country of origination.

21.     WAIVER OF SALVAGE:  In the event that the Customer of the subject freight has required Broker to waive rights of salvage or resale, Carrier hereby expressly waives any and all rights of salvage or resale of the subject freight to the same extent as waived by Broker.

22.     WAIVER OF RIGHTS:   Pursuant to 49 USC 14101, to the extent that such rights or remedies conflict with the terms and conditions of this Agreement, Carrier hereby expressly waives any rights and remedies available to Carrier under (1) state, (2) federal or (3) common law or (4) under 49 U.S.C, Subtitle IV, Part B.

23.     DISPUTE RESOLUTION: In the event of a dispute arising out of this Agreement and the services provided by each Party hereunder, including but not limited to Federal or State statutory claims, the Parties agree the venue for any such action shall be exclusively within the federal and state courts located in Hamilton County, Ohio, and by executing this Agreement the Parties expressly submit to the jurisdiction of said courts located in Hamilton County, Ohio. Unless preempted or controlled by federal transportation law and regulations, the laws of the State of Ohio shall be controlling regarding all disputes arising out of this Agreement and the services provided by each Party hereunder.

01.2015

**initial here** _____



**carrier packet**

fax back to: 888.871.0777
P: 866.414.9555
PO Box 14508
Cincinnati, OH 45250

24.  MODIFICATION of AGREEMENT: This Agreement and any rate confirmation sheets or other shipping documents related to or arising out of this Agreement may not be amended, except by mutual written agreement signed by Broker.

25.  CONTRACT TERM: The initial term of this Agreement shall be one (1) year from the date first written above (the "Initial Term"), and upon expiration of the Initial Term or any subsequent Renewal Terms (if applicable), this Agreement shall automatically be renewed for successive one (1) year periods (each a "Renewal Term"), unless either Party provides written notice of termination to the other no fewer than thirty (30) days prior to the then current term. Notwithstanding the foregoing, Broker may terminate this Agreement at any time upon thirty (30) day's prior written notice, with or without cause.

26.  SEVERANCE SURVIVAL: In the event any of the terms of this Agreement are determined to be invalid or unenforceable, no other terms shall be affected and the unaffected terms shall remain valid and enforceable as written. The representations, rights and obligations of the parties hereunder shall survive termination of this Agreement for any reason.

27.  COUNTERPARTS: This Agreement may be executed in any number of counterparts each of which shall be deemed to be a duplicate original hereof.

28.  COVERED AFFILIATES. US Logistics, LLC is a covered affiliate of Nationwide Logistics, LLC and is a party to this contract. By executing this Agreement, Carrier expressly agrees that all of the terms and conditions of this Agreement shall be enforceable by US Logistics, LLC.

29.  FAX CONSENT: The Parties to this Agreement are authorized to fax to each other at the number shown herein, (or otherwise modified in writing from time to time) shipment availabilities, equipment and rate promotions, or any advertisements or services.

30.  ENTIRE AGREEMENT: This Agreement and any rate confirmation sheets or other shipping documents related to or arising out of this Agreement, unless otherwise agreed in writing signed by Broker, contains the entire understanding of the Parties and supersedes all verbal or written prior agreements, arrangements, and understandings of the Parties relating to the subject matter stated herein. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and that no extrinsic evidence may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement.

31.  NOTICES: All notices provided or required by this Agreement, shall be made in writing and delivered, return receipt requested, to the addresses shown herein with postage prepaid; or by confirmed (electronically acknowledged on paper fax. The Parties shall promptly notify each other of any claim that is asserted against either of them by anyone arising out of the Parties performance of this Agreement. Notices sent as required hereunder, to the addresses shown in this Agreement shall be deemed sent to the current address unless the Parties are notified in writing of any changes in address.

IN WITNESS WHEREOF, the Parties have executed this Broker-Carrier Agreement as of the date and year first written above.

(Broker)

Nationwide Logistics, LLC

By: _____

Printed name: _____

Title: _____

PO Box 14508
Cincinnati, OH 45250

**sign here**

(Carrier)

Carrier: _____

By: _____

Printed Name: _____

Title: _____

Address: _____

City, State, Zip: _____

01 2015

**EXHIBIT A**

# Exhibit B

To: Tony Chui    Page 1 of 1    2016-09-14 13:16:28 (GMT)    18888453606  From: T &amp; L. ENTERPRISES INC

PRO# 103242

*TLCopyright 2010 J.J. KELLER &amp; ASSOCIATES, INC. Neenah, WI • USA • (800) 327-6868 • Perforated — Tear Apart for Permanent Record.*

**STRAIGHT BILL OF LADING – ORIGINAL – NOT NEGOTIABLE**

Shipper's No.

Carrier T & L ENTERPRISES IN         SCAC _____   Carrier's No. MC# 458.677

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations.

at _____ date _____ from _____

| | |
|---|---|
| TO: WINTER GREEN RESORT | FROM: SPARTAN FORT BRAGG |
| Consignee ROUTE 664 | Shipper SPARTAN RACE |
| Street | Street 3610 SOUTH LAKE RD |
| Destination NELSVILL/WINTERGREEN VA 22958 | Origin FORT BRAGG NC Zip 28310 |
| Route | |
| Delivering Carrier T&L ENTERPRISE INC  Vehicle 76-89 - 1C | |

| Number and Type of Packages | HM | P·O Number | Description of Articles | Hazard Class | Fue Class | Total Quantity | Weight (Subject to Correction) | Class or Rate |
|---|---|---|---|---|---|---|---|---|
| | | | SPORTS EQUIPMENT | | | | | |

Remit COD to:
Address:
City: _____ State: _____ Zip: _____

NOTE: Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding $ _____ Per _____

NOTE: Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. 14706(c)(1)(A) and (B).

COD AMT: $

TOTAL CHARGES: $

PLACARDS REQUIRED    PLACARDS SUPPLIED

COD FEE: Prepaid ☐ $
Collect ☐ $

FREIGHT CHARGES:
☐ Prepaid  ☐ Collect
☐ BY SHIPPER  ☐ BY CARRIER

DRIVER'S SIGNATURE

| SHIPPER: SPARTAN FORT BRAGG | CARRIER: T&L ENTERPRISES INC |
|---|---|
| PER: _____  DATE 09-13-16 | PER: _____  DATE 09-13-16 |

EMERGENCY RESPONSE
TELEPHONE NUMBER:

NAME OR CONTRACT NUMBER
OR OTHER UNIQUE IDENTIFIER:

431 (Rev. 9/10)

**EXHIBIT A**

# Exhibit C

EXHIBIT A

FREIGHTLINER    ISUZU    WABASH

**EXCEL**
TRUCK GROUP

3243 Lee Hwy., P.O. Box 96
Weyers Cave, VA 24486
(540) 234-0999 · Fax (540) 234-0997
Heavy Duty Mon. - Fri. 7:00 am - Midnight
Sat. 8:00 am 3:00 pm
Trailer/Body Mon. - Fri. 8:00 am - 4:30 pm

CUSTOMER #: 709788
UNIT# SPARTAN

SPARTAN RACE

202308

*INVOICE*

PAGE 1

HOME:                CONT:N/A
BUS:                 CELL:           SERVICE ADVISOR: 997 DAVID SANDRIDGE

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|------------|-----|---------|----------------|-----|
| | 01 | TRAILMOBILE VAN-TRAI | 2MN01JAH811000100 | ANE-693 | 2/2 | SPARTA |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|--------|------|---------|-----------|
| 01JAN01 DD | | | 23:54 28SEP16 | | 0.00 | CHG | 04OCT16 |

| R.O. OPENED | READY | OPTIONS: | DLR:VJFD |
|-------------|-------|----------|----------|
| 28SEP16 | 04OCT16 | | |

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|
| A REPLACE 5 PANEL ON RIGHT SIDE | | | |
|    23-G TRAILER/TRUCK BODY WORK, GENERAL | | | |
|      1124 CTRP | | | |
|      1252 CTRP | | | |
| | | 4900.00 | 4900.00 |
|   5 PNL2-7 PPW/WASH, 050 X 49 X 110, PVC | 178.06 | 145.68 | 728.40 |
|   7 SPO-TM01 GALV PNCH 112 R90-4-1988P-0-112 | 46.06 | 37.69 | 263.83 |
|   8 WABE0821200 J-MOULDING, 10' | 15.15 | 12.59 | 100.72 |
|  20 ALU1-4 ROOF COIL 040 | 29.48 | 22.59 | 451.80 |
|   1 FREIGHT FREIGHT | 350.00 | 250.00 | 250.00 |
|   1 TAP1-4 1/16"T X 3/4"W X 200'L | 26.79 | 16.09 | 16.09 |
|   2 RVT6-266 X 5/8", 195PCS PER LB, 5/8" HEAD | 18.01 | 10.82 | 21.64 |
|   2 VM221-522 GRAY CAULK | 11.79 | 10.18 | 20.36 |
| 100 53402 PEEL RIVIT | 0.51 | 0.44 | 44.00 |

PARTS:  1896.84  LABOR:  4900.00  OTHER:    0.00  TOTAL LINE A:    6796.84
2 REPLACE 5 PANEL ON RIGHT SIDE, REPLACE 7 RIGHT SIDE POST, REPAIR
ROOF AT J-TRIM, REMOVE & INSTALL INSIDE RACKS AS NEEDED FOR REPAIRS.
STRAIGHTEN RIGHT SIDE BOTTOM RAIL.
*******************************************************************

| B** REFINISH TRAILER SIDE PANELS | | | |
|---|---|---|---|
|    23-G TRAILER/TRUCK BODY WORK, GENERAL | | | |
|     1099   CPB | | 6.72 | 6.72 |
|    1 MISCB PAINTMATERIALS | 368.00 | 368.00 | 368.00 |
|    1 MISCB HAZMAT | 10.00 | 10.00 | 10.00 |

PARTS:   378.00  LABOR:    6.72  OTHER:    0.00  TOTAL LINE B:     384.72
2 REFINISHED NEW SIDE PANELS WITH INDUSTRIAL 3.5 FLAT BLACK.
*******************************************************************

All claims and returned goods must be accompanied by this invoice. No returns on
electrical. Twenty percent (20%) Restocking Charge on special order parts.

Remit To: Excel Truck Group
P.O. Box 7178
Roanoke, VA 24019
(540) 777-7700

**PLEASE SEE REVERSE SIDE FOR ADDITIONAL TERMS AND CONDITIONS
THAT ARE PART HEREOF.**

CUSTOMER SIGN & PRINT

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | 4906.72 |
| PARTS AMOUNT | 2274.84 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 25.00 |
| TOTAL CHARGES | 7206.56 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 120.56 |
| PLEASE PAY THIS AMOUNT | 7327.12 |

**CUSTOMER COPY**

Copyright 2014 CDK Global, LLC   SERVICE INVOICE TYPE 2 - SI2C - IMAGING

**EXHIBIT A**



JMR Graphics Inc.
201 Creative Drive
Central Islip, NY 11722
800.378.6343
jmrgraphics.com

October 4, 2016

Russell Cohen
Spartan Race
234 Congress Street
Boston , MA  02110
russell@spartan.com

**Proposal #: 20160963MS-10**

Thank you for your interest in JMR Graphics as your pressure sensitive adhesive vinyl graphics provider. Our proposal is to provide you with a wrap.  Please review the following pricing documentation and upon approval, please sign and return via fax or email.  If you have any questions, please contact me at 800.378.6343 or email to cdangelo@jmrgraphics.com.

**Project Quote**

53 Ft Trailer Wrap

| Quantity | Unit Price |
|---|---|
| 1 Set | $2,955.00 |
| Installation | $2,234.00 |
| Removal | $1,355.00 |

Production Details  7yr MCS Warranty

A set consists of sides and rear.
(3M IJ180CV3-10 Film, 8518 Laminate, Digital 6-Color & Square Cut)

**EXHIBIT A**



JMR Graphics Inc.
201 Creative Drive
Central Islip, NY 11722
800.378.6343
jmrgraphics.com

---

## Spartan Race

### General

- Payment Terms:
  50% Down & 50% Upon Completion
- Shipping, Packaging & Handling Charges
  will be additional
  (FOB JMR Graphics – Central Islip, NY)
- Sales tax will be applied as per applicable
  law of location to which products will be
  shipped or services provided.
- Production of graphics takes
  approximately 10 to 15 business days from
  the date of signed approval and approval
  of creative.
- Delivery of this order is contingent on
  availability of material, labor, acts of God
  and or conditions beyond the control of
  JMR Graphics.
- JMR Graphics accepts payment by check.
- As it is not always possible to print the
  exact quantity ordered, it is agreed that an
  over-run or under-run of not more than 5%
  will be  billed and is accepted as fulfillment
  of this order.
- If a survey is required, additional charges will
  be applied to the final invoice.

### Production

- Templates will be released upon approval and
  receipt of signed quote.
- JMR Graphics will provide one vinyl proof for
  color reference on new art projects. There
  will be a $200 charge for each additional proof.
  Section proofs will  be charged at $325 each.
- Once approved, JMR will not be responsible
  for the cost of remaking or replacing the
  graphics due to layout, color and or other
  changes not noted to production methods.

## Proposal  #: 20160963MS-10

### Production

- The estimate includes layout, prepress and color
  adjustments. If more extensive artwork is needed,
  it will be charged at a rate of $80 per hour.
- In order for production to match your color
  identity, we need to be provided with PMS
  colors or a color sample/reference. JMR
  Graphics, will make every effort to match PMS
  colors, or samples provided (PMS colors can only
  be approximated using digital production).
- We are not responsible to be knowledgeable
  of laws and regulations regarding door legal
  information.  Please be sure to check with your
  local DOT.
- JMR Graphics will not be held liable for
  low-resolution images provided; high resolution
  images can be purchased at an additional
  charge of $50 per image.
- Artwork altered by JMR for this order will remain
  the property of JMR Graphics and may not be
  used for any purpose except the completion of
  this order.
- If order is not executed, a charge of $80 per hour
  will be billed for any and all artwork completed
  by JMR Graphics.

### Installation

- Installation of graphics will take approximately
  approximately 15 – 20  business days from
  the approval of creative.
- Vehicles must be cleaned and stored inside the
  night prior to installation unless otherwise
  specified. If indoor space is not available,
  arrangements can be made for rental space
  at an additional cost.
- JMR Graphics will not be held liable for any issues
  related to improper install conditions such as
  temperature or dust.
- Removal prices are estimated and subject to
  change based upon difficulty level.

---

In order for JMR Graphics to proceed in manufacturing the above, an authorized company purchasing agent must sign
and fill out the acceptance below and either fax us 631-234-7780 or email to  cdangelo@jmrgraphics.com, in addition to
any purchase orders needed.

Purchasers Signature: _____    Date: _____    PO# _____

By digitally signing your name above, you are hereby electronically accepting the terms outlined within the document.